UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF | DOCKET NO 09-11145 A |
| THUNDERVISION, LLC | Chapter 11 |
| DEBTOR | |

.............................................................................................................................

| | |
|---|---|
| THUNDERVISION, LLC | ADVERSARY NO. 09-1063A |
|   d/b/a *Louisiana Homes & Gardens* Magazine | |
|      PLAINTIFF | |
| v | |
| DROR INTERNATIONAL, LP | |
|      DEFENDANT | |

***Administratively consolidated for trial with***

| | |
|---|---|
| DROR INTERNATIONAL, LP | ADVERSARY NO. 09-1088 A |
| NMI ENTERPRISES, INC. | |
|      PLAINTIFFS | |
| v. | |
| THUNDERVISION, LLC, et al | |
|      DEFENDANTS | |

**<u>MEMORANDUM OPINION</u>**

### I.  Procedural History

On December 6, 2006, DROR International, L.P. ("DROR") and NMI Enterprises, Inc. ("NMI") filed a Suit on Open Account in the 295th Judicial District Court of Harris County, Texas against Thundervision, L.L.C. ("Thundervision" or "Debtor"), Roger W. Smith ("Smith") and Dale G. Higgins, Jr.  ("Higgins").  Following a grant of a Special Appearance in favor of Louisiana jurisdiction, DROR refiled its Suit on Open Account on July 6, 2007 ("DROR Complaint") in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, State of Louisiana ("State

Court").[1]   On April 21, 2009, Debtor filed a Voluntary Petition for Relief under Title 11, Chapter 11 of the United States Bankruptcy Code.   Debtor removed the DROR Complaint to the United States District Court for the Eastern District of Louisiana ("District Court") on June 1, 2009. The District Court severed the actions against the defendants, transferring the causes of action against Debtor to this Court, while those against Smith, Higgins and other named defendants were remanded to State Court.[2]

On May 26, 2009, DROR filed proof of claim number 4 ("Claim").  On June 1, 2009, Debtor filed a joint Objection to DROR's Claim and Complaint for Damages for Negligence, Breach of Contract, Breach of Express and Implied Warranties, Conspiracy and Unauthorized Access to Computer Records and for Violation of 18 U.S.C. 1030 and 2510, *et. seq.* ("Debtor Complaint").[3] The DROR and Debtor Complaints were consolidated for trial on the merits.

On September 29, 2009, DROR was granted Partial Summary Judgment on invoice numbers 11343, 11366, 11367, 11415 and 11422, totaling $143,728.05.[4]  The Partial Summary Judgment reserved all rights of setoff or offset held by Thundervision based on its independently asserted claims.  DROR's request for summary judgment on a sixth invoice, no. 11416 in the amount of $37,683.35, was denied due to the existence of genuine issues of material fact.

Trial on the merits was conducted on December 15 and 16, 2009, however, the record

---

[1]  P-1, Adv.no. 09-1088.

[2]  Wright Avenue Associates, LLC was later added as a defendant.

[3]  P-1, Adv. 09-1063.

[4]  P-18, Adv. No. 09-1088.

remained open to allow the submission of additional testimony by deposition.[5]  Depositions were submitted into the record and all post-trial briefing was completed on March 1, 2010, after which the Court took the matter under advisement.

## II.  Facts

Smith, individually, began publishing a magazine titled, *Louisiana Homes & Gardens* in early 2004.  On February 5, 2004, Smith, d/b/a *Louisiana Homes & Gardens* entered into a Printing Agreement ("2004 Agreement") for the magazine with NMI.[6]

In late 2004, Smith and Higgins formed Thundervision for the purpose of publishing *Louisiana Homes and Gardens*.  Smith contributed his rights in the magazine to the new company. The 2004 Agreement was also assigned to Thundervision.[7]

Under the terms of the 2004 Agreement, NMI was to print *Louisiana Homes & Gardens* for a period of thirty-six (36) months or until March 2007.[8] The 2004 Agreement specified the printing was to be on 10 x 13 ½ size paper, also known as tabloid size, of "45 lb, #5" type.[9]

---

[5]  P-77.  The record was left open until transcripts of the post-trial depositions of Cyrus Bonakchi, Beth Claybourn and Andy McDonald could be submitted.

[6]  Exh.1.  The 2004 Agreement is printed on letterhead of "DROR International, an NMI Enterprises, Inc. Company" and signed by Nitzan Mendelbaum, as President of NMI Enterprises, Inc.

[7]  T.T. Smith, 26:16-27:1. No evidence of the assignment was submitted, but Thundervision has not raised as a defense to either summary judgment or at trial on the merits that it was not the responsible party under the various printing agreements with DROR or NMI.

[8]  Exh.1.

[9]  *Id.*, T.T. Smith, 28:2-3.  In addition, eight cover pages at 60 lb weight on coated free sheet #3 were also specified.

The Terms and Conditions section, paragraph 3 of 2004 Agreement also provided:

3.  TERMS OF PAYMENT....Claims for defects, damages or shortages must be made by the customer in writing within a period of five days after delivery of all or any part of the order.  Failure to make such claim within the stated period shall constitute irrevocable acceptance and an admission that they fully comply with terms, conditions and specifications.[10]

In addition, paragraph 15 of the Terms and Conditions section states:

In the event that the goods delivered to customer by NMI are not satisfactory to Customer, the Customer agrees not to incur an expense with reference to said good, and that if any such expense is incurred by Customer, that NMI shall not be liable to Customer for any part of same.[11]

Paragraph 16 also provides:

The Customer shall indemnify and hold harmless NMI from any and all fees, cost, expense, and damages (including court costs, and reasonable attorney fees) on account of any and all manner of claims, demands, actions and proceedings that may be initiated against NMI on grounds alleging that the said printing violates any copyrights or any proprietary rights  ... defend and continue the defense of any such claim.[12]

In October 2005, NMI printed the October/November issue of *Louisiana Homes & Gardens.*

Debtor alleges that it was printed on paper that did not comply with the 2004 Agreement.[13]

In August 2006, Debtor approached DROR regarding the publication of a new magazine,

*Louisiana Health.*  The new magazine was to be printed on smaller, 9 x 10 7/8 or quarter book size,

pages.[14]  At the same meeting, Debtor requested that the printing format of *Louisiana Homes &*

---

[10]  *Id.*

[11]  *Id.*

[12]  *Id.*

[13]  T.T. Smith, 25:1-29:4.

[14]  T.T.Smith, 37:8-20.

4

*Gardens* also be modified to quarter book size and that the paper quality be improved.[15]  Debtor requested that *Louisiana Homes and Gardens* use the new size for the November 2006 issue.[16]

After meeting with the representatives of Thundervision, DROR prepared a Printing Agreement ("2006 Agreement") for *Louisiana Health* in the name of DROR International, L.P. and forwarded it to Debtor for signature.[17]   The 2006 Agreement does not carry a specific date of execution or effectiveness but instead provides, "Executed and effective this ___ day of August, 2006."  The 2006 Agreement was accepted by Thundervision and returned to DROR.[18]

On September 25, 2006, DROR also prepared a printing quotation for the publication of *Louisiana Homes & Gardens*.  The printing quotation varied from the terms of the 2004 Agreement with regard to paper size and quality ("Quotation").   The Quotation submitted by DROR to Thundervision changed the finished size of *Louisiana Homes & Gardens* magazine to 9 x 10 7/8. The interior paper quality was specified as "47 # text matte, approx. 90 brightness."[19]  Smith signed the Quotation on behalf of Thundervision on September 25, 2006.[20]

The Quotation also contained a reference, "Please see conditions affecting the price of paper and other general provisions in the 'Paper Terms and Conditions Acknowledgment' form attached." The Quotation did not have an acknowledgment form attached.

---

[15]  T.T.Smith, 34:21-35:9.

[16]  T.T.Smith, 36:11-23; Rozlan Hanchar Fransen ("Fransen"), 139:5-10.

[17]  T.T.Smith, 37:21-24.

[18]  Exh.4, T.T.Smith 38:11-13.

[19]  Exh.22.  The Quotation specifications allowed for eighty (80) interior pages.  Four (4) cover pages printed on 80 lb. paper were also provided.  Additional interior pages were subject to a price adjustment.

[20]  Exh.22;T.T.Smith, 43:13-19.

5

On October 20, 2006, DROR sent Debtor another printing quotation. This quotation was for the printing of 500,000 subscription reply cards to be inserted into the monthly publications of *Louisiana Homes & Gardens* and *Louisiana Health*. The quotation was accepted by Thundervision on the same day.[21]

The November 2006 editions of *Louisiana Homes & Gardens* and *Louisiana Health* were published in quarter book size. *Louisiana Homes and Gardens* was delivered to Thundervision on November 3, 2006. Invoice number 11416 notes that the November 2006 edition of *Louisiana Homes & Gardens* was printed on "40lb matte #2 and 10 pt cover with UV Matte 9 x 10 7/8."[22]

On November 15, 2006, Thundervision terminated its business relationship with DROR.[23] At termination, DROR claims the following amounts were outstanding:

| Invoice | Date | Publication | Amount |
|---------|------|-------------|--------|
| 11343 | 9/1/06 | *Louisiana Health (Sept. 2006 issue)* | $29,012.31 |
| 11366 | 10/2/06 | *Louisiana Health (Oct. 2006 issue)* | $28,167.20 |
| 11367 | 10/2/06 | *Homes & Gardens of Louisiana (Oct. 2006 issue)* | $43,197.07 |
| 11415 | 11/2/06 | *Louisiana Health (Nov. 2006 issue)* | $30,183.87 |
| 11416 | 11/3/06 | *Homes & Gardens of Louisiana (Nov. 2006 issue)* | $37,683.35 |
| 11422 | 11/4/06 | *Reply cards* | $13,167.60[24] |

Between February 1, 2007 and March 14, 2007, Smith's email account at Thundervision was accessed sixty-eight (68) times by Nitzan Mendelbaum ("Mendelbaum"), the president of NMI and

---

[21]  Exh.2.

[22]  Exh.3; T.T. December 16, 2009 ("T.T. II"), Smith 70:6-10.

[23]  Motion for Partial Summary Judgment filed by Debtor, P-11, Adv. No. 09-1063; T.T. Smith 47:11-23.

[24]  Motion for Summary Judgment filed by DROR, P-4, Adv. No. 09-1088)

manager of DROR, without permission.[25]

On March 21, 2007, Debtor filed a citizen's complaint with the Louisiana Department of Justice, Office of the Attorney General High Technology Crimes Unit ("HTCU") based on the unauthorized access of Debtor's business e-mail accounts.

The HTCU report confirmed that Debtor's computer systems had been accessed without authorization numerous times between February 1 and March 16, 2007.[26]  Specifically, Smith's email account, *via* Thundervision's web server, was accessed on sixty-eight (68) different occasions over twenty-eight (28) days from IP addresses registered to Mendelbaum.[27]  Additional access was obtained by Laurie Felton ("Felton"), a former employee of Thundervision, through IP addresses registered in her name.[28] On eleven (11) occasions occurring on March 3,5,7,8,9,10,11,12,13,14,and 15,2007, both Felton and Mendlebaum's IP addresses were used to access Thundervision's computer system on the same day.[29]

Felton resides in Destrahan, Louisiana and Mendlebaum resides in Sugarland, Texas a community outside of Houston.  DROR and NMI operate out of Mendlebaum's home.[30]

As a result of Debtor's complaint to the HTCU, Felton was arrested for unauthorized use of

---

[25]  T.T.Sean Becnel ("Becnel"), 163:14-164:2; 164:8-165:3; Exhs.27,28.

[26]  T.T.Becnel, 164:3-22.

[27]  T.T.Becnel, 175:22-176:1;176:16-20; Exh. 27,28.

[28]  T.T.Becnel, 171:11-24;177:11-23; Ehxs.27,28.

[29]  T.T. Becnel, 177:25-178:17; Exhs.27,28.

[30]  T.T.Mendlebaum, 189:8-18; Becnel,171:11-24.

a movable.[31]

Debtor alleges damages due to breach of the 2004 Agreement and Quotation.  It further alleges that those damages exceed the amounts owed to DROR under invoices 11343,11366, 11367, 11415, 11422, and 11416.  In addition, Thundervision alleges that Mendelbaum and/or DROR and/or NMI violated 18 U.S.C. §1030, *et. seq.,* 18 U.S.C. §2510, and Thundervision's rights under state law.  As a result of these violations, additional damages are due.  DROR asserts that its account is fully owed and denies violations of either federal statute or state law.

## II.  Law and Analysis

### A.    Contractual Dispute

*Louisiana Homes & Gardens* is a local magazine catering to local interior designers, architects, homeowners and those members of various trades and retail establishments that sell to them.  The magazine features Louisiana homes and contains large photographs of its subjects.  Advertisements in the magazine also heavily invest in photographic displays.  Thundervision maintains that the October/November 2005 and November 2006 editions of *Louisiana Homes & Gardens* were printed on inferior quality paper.  As a result, the colors of the magazine's photographs were not true and its appearance was of inferior quality, causing a loss of  advertising revenue, subscribers and damage to its reputation.  DROR alleges that the quality of the paper was approved by Thundervision and that no timely written complaints were made by Thundervision for either issue as required by its agreements.

Two written agreements for the publication of *Louisiana Homes & Gardens* exist.  The first, executed by Smith in February 2004, provided for publication on tabloid format paper.  Later that

---

[31]  Exh.26.

8

same year, Smith and Higgins formed Thundervision, L.L.C., Debtor, and Smith's rights to the publication, as well as, the 2004 Agreement, were contributed to the new company. In August of 2006, Smith approached Mendlebaum regarding a change in the magazine's appearance. At a lunch in New Orleans, Smith explained that he wanted to transition to a smaller paper size of higher quality. He also discussed Thundervision's publication of a new magazine, *Louisiana Health,* which he also wanted to publish on quarter book, high quality paper. He brought several copies of other magazines to illustrate the type of look he envisioned and asked Mendlebaum to give him quotes.[32]

Mendlebaum testified that paper is a commodity not always readily available in the size and quality requested.[33]  He claims to have related this to Thundervision at the meeting in  August, advising that significant lead time might be required if the format were to change.

After leaving the meeting, Mendlebaum obtained quotes for the new paper and forwarded the 2006 Agreement to Thundervision for *Louisiana Health*.[34]  The agreement is almost identical in its terms to the 2004 Agreement, except that it relates to the publication of the new magazine and specifies different paper quality and size than that contained in the 2004 Agreement.  The 2006 Agreement was accepted by Thundervision, and *Louisiana Health's* first edition was published in quarter book size  in September 2006.[35]  Debtor voiced no complaints with the production or quality of *Louisiana Health* issues at  the  time,  although  at trial,  Debtor's  Art  Director  expressed  her

---

[32]  T.T.Smith, 36:1-5; Fransen, 132:13-133:25.

[33]  T.T.Mendlebaum, 186:21-23.

[34]  Exh.4.

[35]  The invoices submitted by DROR indicate a publication date of September 2006.  Hoewver, Thundervision represented at trial that the first publication date was November 1. T.T.Fransen, 139:5-10.

9

dissatisfaction.[36]

With regard to *Louisiana Homes & Gardens*, Mendlebaum did not include within the 2006 Agreement, any provision for its publication.  Instead, Mendlebaum prepared the Quotation of September 26, 2006.  That document specified the paper size and quality for both magazines, matching that contained in the 2006 Agreement for *Louisiana Health*, but modifying the terms of the 2004 Agreement for *Louisiana Homes & Gardens*.[37]  Thundervision accepted the quotation the same day and returned it to DROR.[38]

Mendlebaum testified that he did not purchase the paper to print *Louisiana Homes & Gardens* and specified in the Quotation when the Quotation was prepared. Instead, he only purchased enough paper to publish *Louisiana Health* in the quarter book format.[39]

DROR and Thundervision's schedule for production of the November 2006 issues was fairly rigid.  In order to meet Thundervision's retail delivery deadlines, a disc containing the electronic substance of the editions was delivered by Thundervision to DROR one and one half (1 ½) weeks before the issues' publication date or month's end. Because this was a new format, Thundervision needed additional time to prepare its copy.  The formatting disc was supplied by DROR six (6) weeks before it was due to the printer, giving Thundervision a month to prepare its copy.  DROR supplied Thundervision with the formatting requirements for publication on or about September 7. This gave DROR time to format the disc for printing, allowed time for Thundervision to verify the

---

[36]  T.T.Fransen, 139:11-20.

[37]  Exh.22.

[38]  *Id.*, T.T. Smith, 43:13-19.

[39]  T.T.II Mendlebaum, 69:4-6.

layout by DROR, and enabled DROR to print and deliver the magazine by late October, 2006.[40]

The 2006 Agreement for *Louisiana Health* was executed in August of 2006 with the first date of publication occurring in September 2006.[41]  As with *Louisiana Homes & Gardens*, *Louisiana Health*'s content was forwarded to DROR in an electronic format. The format was specific to quarter book size and could not be modified by DROR for any other size paper.[42]  The magazine was printed by DROR on the correct size and quality paper.[43]

Using the same format, the content of the November 2006 issue of *Louisiana Homes & Gardens*, was delivered to DROR on or about October 20, 2006. As with the *Louisiana Health* disc, the content was page size specific and could not be modified to Thundervision's previous tabloid size without recreating the entire file.[44]  Its printing did not go smoothly.

At trial, Mendlebaum testified that because the September 25, 2006 Quotation was not delivered to DROR until after its September 26, 2006 execution, it was impossible for DROR to obtain the proper paper stock to print the November 2006 edition under the terms of the Quotation. According to Mendlebaum, the paper specified in the Quotation could only be obtained from Finland

---

[40] T.T.Fransen, 135:3-12; 137:6-9; 137:10-138:3.  The testimony conflicts with the initial date of publication for *Louisiana Health*.  The Court concludes that the delivery of formatting specification and copy to the printer must have occurred in August or even July 2006.

[41] The 2006 Printing Agreement states that the "agreement shall remain in effect beginning August 2006 through September 1st, 2009 Issue".  Exh. 4.  As noted above, Debtor has not paid invoices for the printing of *Louisiana Health* in September or October 2006.  Fransen testified that the first edition of *Louisiana Health* was published on November 1.  T.T. 139:5-10.  This testimony was in error.

[42] T.T.II Mendlebaum, 66:21-67:2.

[43] T.T.Fransen, 135:25-136:13.

[44] T.T.II Mendlebaum,66:21-67:2.

at a delay of eight (8) to ten (10) weeks.[45]  Since DROR was required to deliver the magazine within

five (5) weeks of the Quotation in order to meet Thundervision's newsstand delivery date,

Mendelbaum began looking for substitutes.[46]

According to DROR's paper supplier, DROR began looking for quarter size paper in mid

September or about five (5)  weeks after the August meeting with Thundervision and only five (5)

weeks before the November printing deadline.[47]  When the exact stock required by the Quotation

could not be found, a substitute of similar quality was located.  However, shortly before printing,

NMI discovery that it could not secure sufficient quantities to fill the order.[48]  On the eve of its

printing deadline DROR could not locate the specified paper nor an acceptable substitute, therefore,

it opted to use a lesser quality paper for publication.[49]

The record establishes that the paper specified in the Quotation was unavailable when the

printing of the November 2006 edition occurred.  DROR established that securing the paper in

question took eight (8) to ten (10) weeks and that obtaining the paper was not a question of price but

availability.    DROR's position was   substantiated by Thundervision's own expert who

acknowledged that any specific paper size and quality might be difficult to obtain on short notice.[50]

Thundervision's expert also allowed that printers like DROR rarely stock large quantities of paper

---

[45]   T.T.Mendlebaum, 205:20-206:9; 206:12-18.

[46]   T.T.Mendlebaum, 206:16-207:6.

[47]   T.T II.Mark Russo ("Russo"), 93:22-94:4.

[48]   T.T II.Russo, 94:10-21.

[49]   T.T.II, Russo, 94:22-95:25.

[50]   T.TII.Ernest Seals ("Seals"), 42:21-43:15.

without a specific need because of the excessive costs involved.[51]

When DROR could not obtain the specified paper, it claims to have sent a sample of the product it used to Thundervision by Federal Express.  It also alleges that Thundervision orally consented to use the paper in question.  DROR claims to have warned Thundervision as early as August 2006, that it might take ten (10) weeks lead time to secure the right paper in quarter book size.  DROR offered no evidence to corroborate this position and the Quotation does not contain a provision for this known possibility.  For example, the Quotation does not delay the use of quarter book printing to a date ten (10) weeks subsequent to acceptance.  Nor does it warn of any difficulty in obtaining a sufficient supply on short notice.

Thundervision argues that the November 1 printing date was selected at the August 2006 meeting, specifically to allow Thundervision time to adjust its formatting.  It also happens that August 2006 would be more than sufficient time for DROR to acquire the paper needed to print in quarter book size.  Thundervision claims that it was never told there might be a problem in getting the right paper, denies seeing a sample, or approving any change in quality from that specified in the Quotation.[52]  It also argues that it relied on DROR to produce a quality product, the specifics of which were beyond its ability to define.  It alleges that DROR should have known the inferior paper was not acceptable.[53]

Thundervision's position is buttressed by DROR's prior conduct on at least one occasion.  In September 2005, DROR substituted an inferior quality paper for Thundervision's

---

[51]   T.T.II Seals, 40:19-41:10.

[52]   T.T.II Mendlebaum, 70:18-71:2; Smith, 51:4-7.

[53]   T.T.Smith, 40:16-41:13; 43:7-12; 99:6-100:3.

October/November 2005 edition of *Louisiana Homes & Gardens*.   Thundervision maintained at trial that the substitution was done without its consent or prior approval and DROR did not rebut this assertion.[54] The Court accepts that DROR failed to provide the quality of paper required by its contract with Thundervision.  It also finds that DROR did not warn Thundervision of this possibility in sufficient time to provide a reasonable solution to the problem.

After the publication of the November 2006 issue, Thundervision alleges that it received complaints about the quality of its magazine from advertisers and the trade.  However, the only specific damage Thundervision established at trial was a credit of $2,500.00 given to Andy McDonald representing one month's advertising fee.[55]  Thundervision asserts this damage and unspecified other damages are due to it based on the breach of its agreements with DROR.

The 2004 Agreement between Smith and NMI controls the rights and obligations between Thundervision and NMI or DROR.  The 2004 Agreement was modified by the Quotation in September of 2006.  That quotation amended the size and quality of the paper to be used in the publication of *Louisiana Homes & Gardens*.  While that agreement was not signed by DROR or NMI prior to the publication of the November issue, it was binding on DROR and NMI when executed by Thundervision.

The Quotation was prepared by DROR and transmitted to Thundervision for its acceptance.  The document was accepted without modification or change by Thundervision and returned to DROR.  As such, a valid offer and acceptance was consummated.  DROR evidenced its intention

---

[54]  T.T. Smith, 33:10-25; 34:16-20.  Thundervision's prior experience with DROR on this point lead it to insert in the 2006 Agreement a provision that required Thundervision to approve all paper used to print *Louisiana Health* before printing.  *See,* Exh.4.

[55]  T.T. Smith, 44:10-45:15.

to operate under the modification by publishing *Louisiana Homes & Gardens* in the new quarter book size, a significant departure from the terms of the 2004 Agreement.  Where unchanged, the 2004 Agreement controls the publication of *Louisiana Homes & Gardens*.

The 2004 Agreement provides:

> All claims for defective or damaged work, erroneous charges, late delivery or for shortages must be made by Publisher in writing fully setting forth the nature of the alleged defect, damage, erroneous charge, late delivery or shortage within five days after delivery of the work.  Publisher's failure to so notify Printer shall constitute an irrevocable acceptance and admission that they fully comply with terms, conditions and specifications.[56]

The Quotation did not modify these conditions.

According to the testimony and invoices submitted into evidence, the November 2006 issue of *Louisiana Homes & Gardens* was delivered on November 3, 2006.  Therefore, Thundervision was required to notify DROR of any claims for defects, damages or shortages in writing by November 8, 2006.  Its counsel did not write to DROR on the issue until November 15, 2006.

At trial, Smith testified that within two days of delivery, he sent an email to Mendelbaum complaining about the quality of the paper used, but Debtor failed to produce any evidence of the emails.[57]   Smith asserted that his failure to produce a copy of his email was due to deletions by "someone" of documents from the company's server.  However, neither Smith nor Thundervision's experts offered any evidence that deletions of company records occurred.[58]

---

[56]  Exh.1.

[57]  T.T.Smith, 45:14-46:4.  Following delivery, Thundervision stopped payment on one of the outstanding invoices.  It claimed at trial that this action constituted written notice of its claims with regard to the November 2006 issue of *Louisiana Homes & Gardens.*  The stop payment was for a *Louisiana Health* edition and insufficient to alert DROR of Debtor's displeasure with the *Louisiana Homes and Gardens* November publication.

[58]  T.T. Smith, 78:20-79:7.  Smith's testimony implies that Mendlebaum deleted this evidence when he accessed Debtor's servers.  While the record establishes that Mendlebaum did access Debtor's servers, nothing in the evidence presented suggests that he also had the ability to delete files, or that any of the company's files were

Thundervision also complains about the quality, and damages which resulted, from alleged inferior printing of its October/November 2005 edition. Much of the evidence submitted at trial involved these alleged damages, loss of revenue, reputation and business opportunity. Again, Debtor failed to produce any evidence that it made a claim against DROR, in writing, and within five (5) days of delivery of the October/November 2005 issue. It also continued to utilize NMI's services for months following this incident and even paid the invoice for the printing.

Because of lack of timely notification, any damages associated with the "defective" condition of either edition of *Louisiana Homes and Gardens* cannot be awarded. With regard to the 2006 edition, the Court finds that the only proven damage was a loss of $2,500.00 in advertising revenue and that Thundervision's claims regarding loss of reputation and loss of future business opportunity were both speculative and insufficiently proven. The Court also finds that any claim with regard to damages sustained for alleged defects in the 2005 edition, were waived by Thundervision's voluntary payment of the invoice after it knew of the alleged defects in the product produced.[59]

### B. Thundervision's Counterclaims

Thundervision has alleged three separate causes of action against DROR. All involve DROR's alleged unauthorized access to Thundervision's computer files. The causes of action are based on:

1. The Computer Fraud and Abuse Act or 18 U.S.C. § 1030, *et. seq.;*
2. The Wiretap Act or 18 U.S.C. § 2510; and
3. Damages incurred as a result of illegal and unauthorized access to the computer system, records, and emails of Thundervision under Louisiana law.

---

missing. *See*, T.T. Becnel.

[59]*Brouillette v. Consolidated Const. Co. of Florida, Inc.*, 422 So.2d 176 (La. App. 1st Cir. 1982)

## 1.  The Computer Fraud and Abuse Act

In 1984, Congress enacted the Computer Fraud and Abuse Act ("CFAA" or "Act")  to enhance the government's ability to prosecute computer crimes.  The Act "was originally designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality..."[60] The prohibited acts generally involve accessing computers without authorization or in excess of authorization, then taking forbidden actions, ranging from obtaining information to damaging a computer or computer data.[61]

In 1994, Congress created a federal private cause of action for intentionally accessing a protected computer without authorization.  The statutory purpose was to punish trespassers and hackers.[62]  However, the conduct prohibited by CFAA does not produce a civil cause of action unless additional prerequisites are met.

Section 1030(a)(5)(B)(i) requires a threshold of $5,000.00 in "losses" before a civil action can be maintained.[63]  Under the statute, a "loss"  is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost

---

[60]   *LVRC Holdings*, LLC v. Brekka, 581 F.3d 1127, 1134 (9th Cir. 2009); H.R. Rep. 98-894,  1984 U.S.C.C.A.N. 3689, 3694 (July 24, 1984);  *L3 Communications Westwood Corp. v. Robichaux,* 2007 WL 756528 (E.D. La. 3/8/07).

[61]   18 U.S.C. §1030(a)(1)-(7) (2004).  CFAA has been amended multiple times since 1984. The act was last amended in 2008. *See,* Pub.L. 110-326, §§ 203-08. Unless otherwise indicated, all citations in this opinion are to the statute in force in 2007 when the  unauthorized access took place.

[62]   *American Family Mut. Ins.Co. v. Rickman*, 554 F.Supp.2d 766 (N.D. Ohio, 2008).

[63]   *Fiber Systems Int., Inc. v. Roehrs*, 470 F.3d 1150, 1156-1157 (5th Cir. 2006);  *Egilman v. Keller & Heckman, LLP*, 401 F. Supp.2d 105 (D.C. 2005).

17

incurred, or other consequential damages incurred because of interruption of service."[64] "The meaning of 'loss'... has consistently meant the cost of investigating or remedying damage to a computer or a cost incurred because the computer's service was interrupted."[65]

In *American Family,* the Court stated, the "[m]eaning of 'Loss' has consistently meant a cost of investigating or remedying damage to a computer or a cost incurred because the computer's service was interrupted."[66] Other courts also have interpreted "loss" to include the cost of responding to a security breach, such as the cost of performing a computer system damage assessment, even if the losses are not derived from any change to the computers themselves or the information contained on the computer.[67] The CFAA's definition of loss has also been broadly defined as contemplating the costs associated with investigation of an offense.[68]

Debtor spent $8,700.00 restructuring and securing its computers and computer access, securing electronic mail transmission, and conducting a damage assessment to determine the extent of the security breach. Becnel's report notes that he charged Debtor $18.75 per hour for forty (40) hours of work repairing, modifying and investigating these breaches into the computer system. He

---

[64] 18 U.S.C. §1030(e)(11). *See also, Creative Computing v. Getloaded.com, LLC*, 386 F.3d 930 (9th Cir. 2004).

[65] *Nexans Wires S.A., v. Sark-USA, Inc.*, 319 F.Supp.2d 468, 475 (S.D.N.Y. 2004), *aff'd* 166 Fed. Appx. 559 (2006).

[66] *American Family, supra*, at 772(quoting *Nexans Wires, S.A. v. Sark-USA, Inc.*, 319 F.Supp.2d, 468, 475 (S.D.N.Y. 2004), *aff'd* 166 Fed. Appx. 559 (2006).

[67] *NCMIC Fin. Corp. v. Artino*, 638 F.Supp.2d 1042 (S.D. Iowa 2009).

[68] *See, A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F.Supp.2d 975, 980-81 (N.D. Cal. 2008). The Senate Report on the 1996 amendments to the CFAA support this interpretation: "[when] the system administrator [must] devote resources to re-secure[e] the system ... although there is arguably no 'damage', the victim does suffer loss. If the loss to the victim meets the required monetary threshold, the conduct should be criminal, and the victim should be entitled to relief." *EF Cultural Travel BV*, 274 F.3d577, 584 (1st Cir. 2001) (quoting S.Rep. No. 104-357 at 11 (1996)).

also testified that the remedial work cost "cost around $8,000."[69] The Court finds Becnel's actions

reasonable in investigating and responding to DROR's unauthorized access and finds that the

$5,000.00 threshold has been reached.

Having satisfied the economic threshold for recovery, Thundervision must now prove that

Mendlebaum's actions are of a nature proscribed in subsection (a)(5)(B).  In order to establish a

claim, Debtor must prove, by a preponderance of the evidence the relevant elements of the statute.[70]

Thundervision bases its claims on Mendlebaum's unauthorized access of Smith's email

account at Thundervision.  That breach allowed Mendelbaum access to the communications between

Smith, Higgins and Thundervision's counsel regarding the suits pending between Thundervision and

DROR,  Thundervision's financial data, and quotes from its new printer, IPC.  Thus, two sections

of the CFAA are potentially applicable to this case, sections 1030(a)(2)(c) and 1030(a)(4).[71]

Both provisions require that the violation involve unauthorized access of a protected

computer.  For the reasons set forth in detail below, there is no question that Thundervision's

computers were intentionally accessed between February 1, 2006 and March 15, 2006 by at least

two unauthorized users, specifically, Felton and Mendelbaum.  There is also no question that the

access was of a protected computer within the meaning of the statute.  The term "protected

computer" includes any computer "which is used in or affecting interstate or foreign commerce or

---

[69] T.T. Becnel 161:25; 162: 1-17.  Smith also signed an affidavit that $8,700.00 was spent in remedial
work. Exh. 26.  Finally Charles Jagneaux also signed an affidavit that he performed work to secure the computer
after the unauthorized access.  Exh. 26.

[70] *Southwest Airlines Co. v. Boardfirst, LLC,* 2007 WL 4823761 (N.D.Tex. 2007);  *Diamond Power Int'l,
Inc. v. Davidson*, 540 F.Supp.2d 1322 (N.D. Ga. 2007); and *NCMIC Finance Corp. v. Artino*, 638 F.Supp.2d 1042
(S.D. Iowa, 2009).

[71]  Provisions relating to unauthorized access to government computers, data, the data of financial
institutions or credit card issuers have been omitted as irrelevant.

communication."[72] The Eighth Circuit has held that the internet is an "instrumentality and channel of interstate commerce" because it is a means "to engage in commerce and the method by which transactions occur."[73] Because Debtor's computers were connected to the Internet, they "were part of a system that is inexorably intertwined with interstate commerce and thus properly within the realm of Congress' Commerce Clause power." [74]

Thus, in order for Thundervision to successfully assert a private claim under 1030(a)(2)(c) it must prove one remaining element, that DROR obtain information through its unauthorized access.

A successful claim under section 1030(a)(4) requires proof of these additional elements:

1. Access with the intent to defraud; and
2. that the conduct furthers the fraud and obtains something of value; or
3. if the conduct only consists of the computer's use of the computer, and the value of its use is not more than $5,000.00.

### a. Section 1030(a)(2)(c)

The circumstances surrounding the unauthorized access to Thundervision's accounts start with a former employee of the company, Felton. Felton was employed by Thundervision as a sales account executive in August 2005. On October 5, 2006, she was fired.[75]

Shortly after being fired, Felton contacted Mendlebaum in Sugarland, looking for a job.

---

[72] Section 1030(e)(2)(B). *See also, U.S. v. Trotter*, 478 F.3d 918 (8th Cir. 2007) ("Like the Internet, the spectrum is a channel of interstate commerce subject to regulation by Congress."); *Expert Janitorial, LLC v. Williams*, 2010 WL 908740 (E.D. Tenn. 2010) ("Computers connected to the Internet have been held to be 'part of a system that is inexorably intertwined with interstate commerce and thus properly within the realm of Congress's Commerce Clause power.'"); and *U.S. v. Barlow*, 568 F.3d 215 (5th Cir. 2009).

[73]    *U.S. v. Trotter*, 478 F.2d at 921.

[74]    *Id.*

[75]    Smith, T.T.  58:2-7

After discussing the possibility of a sales job with a Dallas publishing company owned by Mendlebaum, she came to Houston for a meeting.[76]  In March of 2007, Felton arrived in Houston and met Mendlebaum for a drink.  She also went to his home/office twice.[77]  During that visit Felton expressed anger over being fired by Smith.[78]

Prior to talking to Felton, Mendlebaum had been sent emails from Felton once or twice.  The emails contained communications between Thundervision and its legal counsel, Phelps Dunbar. Mendlebaum testified that Felton gave him this information because she knew he would be interested in its content.  At the time, NMI's suit against Thundervision was ongoing and Phelps Dunbar was Thundervision's legal counsel in the action.  Mendlebaum admitted to reading those emails and a bid quotation from IPC, Thundervision's new printer.[79]

Sometime after Felton was fired, Smith suspected that his email account at Thundervision had been accessed by an unauthorized user.  On March 14, 2007, Smith advised Becnel, an employee in Thundervisions' IT department, of this concern.  After being alerted to the possible unauthorized access, Becnel changed Smith's password and Thundervision's carrier, preventing any further unauthorized access.[80]  He also obtained from Thundervision's web server, the IP addresses of all persons accessing Thundervision's system.

Becnel discovered several addresses that did not correspond to any authorized users.  Smith

---

[76]  Mendlebaum, T.T. 194:2-195:24.

[77]  Mendlebaum, T.T. 196:1-24.

[78]  Mendlebaum, T.T. 197:8-15.

[79]  Mendlebaum, T.T.227:9-228:23; 251:15-252:3.

[80]  T.T.Becnel, 161:19-24..

21

suspected that the disgruntled former employee, Felton, was the source of these violations. On March 21, 2007, Debtor filed a citizen's complaint with the Louisiana Department of Justice, Office of the Attorney General High Technology Crimes Unit ("HTCU") for the unauthorized access of Debtor's business e-mail accounts.

The HTCU's investigation began with subpoenas to the internet providers of the unknown IP addresses. Becnel had previously determined that Smith's email account, *via* Thundervision's web server, had been accessed by nine (9) different "unauthorized" IP addresses. When the first subpoenaed information was returned, it revealed that two (2) of the IP addresses were registered to Felton at her neighbors' physical addresses.[81]

Then on May 24, 2007, Comcast, a high speed internet provider, advised that two (2) of the other IP addresses accessing Thundervision's account were registered to Mendelbaum. A review of the web access report also revealed access to Thundervision's computer system had been made from both Felton and Mendelbaum's IP addresses on several dates in common. Specifically, on March 3,5,7,8,9,10,11,12,13,14,and 15 both IP addresses obtained access to Debtor's computer system.[82] Further on March 15 and 16, 2007, access was attempted from both Felton and Mendelbaum's IP addresses but denied as a result of Becnel's efforts.[83]

On October 2, 2007, the HTCU investigation informed Debtor that Mendelbaum's IP address appeared as an unauthorized user.

In an attempt to prove that someone, besides Mendelbaum, had accessed Debtor's system

---

[81] Felton was ultimately charged and convicted of a crimes involving this activity.

[82] T.T.Becnel, 171:25-172:13.

[83] T.T.Becnel, 164:18-24.

using his IP address, DROR's expert witness, Daniel Bilar ("Bilar"), explained that IP addresses are assigned to specific physical locations rather than computers.[84]  In Mendlebaum's case, his IP addresses were located in his home/office in Sugarland, Texas.  Mendlebaum had a wireless modem for those addresses that was open to access by anyone that logged onto computers in the home/office or had a wireless connection.  Simply put, Bilar opined that anyone with access to DROR's computers or a wireless access card on a portable computer, could have accessed DROR's IP address.  Once access was secured, any search by that person would appear as access through Mendlebaum's IP address. Therefore, access *via* Mendlebaum's IP address did not prove that Mendlebaum himself accessed the system or that he knew who did.[85]

At trial, Bilar admitted that wireless access to Mendlebaum's IP address would have to be made by someone within 300 feet of Mendlebaum's home.  The implication was that Felton could have had that type of access.[86]

 Mendlebaum claimed a friendly relationship with Felton but not a particularly close one. He testified to receiving only one or two cell phone calls from her and one or two emails.  He met with her two or three times in March in Houston, once over drinks and once or twice in his office. He admitted to reading emails forwarded to him by Felton containing communications between Thundervision and its counsel, as well as, business quotations for printing services.  Mendlebaum denied accessing Thundervision's computers himself and claimed no knowledge that Felton used

---

[84]  T.T.Bilar, 268:15-269:21.

[85]  T. T. Bilar, 268: 15-24; 269: 22-25; 270:1-3; 271:7; 272:17-24.

[86]  T. T. Bilar, 268: 15-24; 269: 22-25; 270:1-3; 271:7; 272:17-24.

his IP addresses to access Thundervision's email accounts.[87]

Thundervision's computer system was accessed sixty-eight (68) times from Mendlebaum's IP addresses.[88]  According to DROR's own expert, access to Mendlebaum's IP address could only be obtained in one of two ways.  First, through direct use of DROR's computers located in Mendlebaum's home, DROR's offices.  Second, though wireless access achieved by someone within 300 feet of Mendlebaum's house.[89]  Since Mendlebaum lives in a residential neighborhood, that access logically would have to occur on the street outside his home.

Felton lives in Destrehan, Louisiana and Mendlebaum testified that she was only in his home/office twice in March of 2007.  While DROR tried to establish that Felton could have accessed Mendlebaum's IP addresses by sitting in a car outside his home, this explanation is implausible at best.  Destrehan, Louisiana is roughly six (6) hours from Sugar Land, Texas.  In order for Felton to have been responsible for the sixty-eight (68) violations, she would have had to sit outside Mendlebaum's home on the twenty-eight (28) days during which that access was obtained.[90]  It is implausible that Felton could have been in Sugar Land camped out in front of Mendlebaum's home for that many days and remained unnoticed.

Even more telling are the days between February 1, 2007 and March 15, 2007 when access was made on the same day, from the IP addresses of both Mendelbaum and Felton, sometimes only minutes apart.  Since Felton could have only accessed Mendlebaum's IP addresses from a location

---

[87] T.T. Mendelbaum 226:14-16; 227:6-8.

[88] Exhs. 27 and 28.

[89] T.T.Bilar, 270:3-271:7.

[90] Exhs. 27 and 28.

within 300 feet of Mendlebaum's home/office, and her own account from a physical location equally

as close to her own home, it is physically impossible for Felton to have accomplished this feat from

the two separate IP addresses on the same day, minutes apart.

Becnel was also able to determine the content of some of the perpetrator's searches. By

looking at web server originations, Becnel established that many of the items read from

Mendlebaum's IP address involved communications between Smith and Phelps Dunbar; emails of

financial data or business strategy between Smith and Higgins; and communications between IPC,

Thundervision's printer, and Smith.[91]  The subject of any of these emails would be of particular

interest to Mendlebaum.

For these reasons, the Court finds that Mendlebaum obtained unauthorized access to the

computers of Thundervision on sixty-eight (68) separate occasions. No one else had access or

reason to be so intrusive. Mendlebaum's motive was simple, he was engaged in a collection effort

against Thundervision and wanted access to its intentions and the advice being given by its legal

counsel. Access to that advice could have given Mendlebaum an advantage in DROR's collection

effort. Once inside Thundervision's email system, he was also privy to financial information

exchanged between Smith and Higgins detailing Thundervision's financial status and business plans.

The Court concludes that Thundervision has proven a claim under subsection 1030(a)(2)(c).

### b. Section 1030(a)(4)

To state a claim under Section 1030(a)(4), a victim must prove that the access was done with

the intent to defraud, and that the defendant obtained something of value. The term "fraud" as used

in CFAA, means wronging a person in his property rights by dishonest methods or scheme, rather

---

[91]  T.T.Becnel, 165:4-20; 167:23-169:24; 182:21-183.15;

than fraud in its common law sense.[92]  The Debtor does not need to plead the elements of common

law fraud to state a claim under the Act.  "Fraud" only requires a showing of unlawful access.[93]  The

First Circuit has decided that the word "defraud" "should apply to those who steal information

through unauthorized access as part of an illegal scheme."[94]   No heightened pleading standard is

required.  The Court finds that Debtor has shown unauthorized and unlawful access with an intent

to defraud.

In addition to accessing information, Section 1030(a)(4) requires that the defendant also must

obtain something of value.  The statute does not define "anything of value," but in *In re: America*

*Online, Inc.* 168 F.Supp.2d 1359 (S.D. Fla. 2001) the court found that a violation must be motivated

by more than mere satisfaction of curiosity.  The AOL court pointed out that "although the typical

item of value in CFAA cases is usually data, in other areas of the law, customers have been found

to be a thing of value...  Particularly relevant to this case is the recognition that damage to an ISP's

goodwill and reputation is actionable under the CFAA or cognizable as a property interest." [95]   In

*Czubinski, supra,* the court defined "anything of value" as "[t]he value of information ... relative to

one's needs and objectives..."[96]

---

[92]  *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F.Supp.2d 1121 (W.D. Washington, 2000).

[93]  *eBay, Inc. v. Digital Point Solutions, Inc.*, 608 F.Supp.2d 1156 (N.D.Cal.2009).  *See also, EnviroGLAS Products, Inv. v. EnviroGLAS Products, LLC,* _ F.Supp.2d__, 2010 WL 1330625 (N.D. Tx. 2010) (CFAA does not require a heightened pleading standard.)

[94]  *U.S. v. Czubinski*, 106 F.3d 1069, 1078 (1st Cir. 1997).

[95]  *In re: America Online, Inc*, 168 F.Supp.2d 1359 (S.D. Fla. 2001).

[96]   *U.S. v. Czubinski* at 1078.

In *Fiber Systems,* the court explained:

> [A] finding that three defendants violated Sect 1030(a)(4) did not necessarily establish that the defendants were thieves. Section 1030(a)(4) deals with unlawful access of computer systems to further fraud. Although the jury found that three defendants violated this section, and that their unlawful access caused a loss to FSI totaling $36,000, the determination did not require a finding that the defendants stole trade secrets or anything else. Section 1030(a)(4) does require a finding that the violator obtained something of value by means of the unlawful access, but the value need not be a trade secret or even something that was stolen. The jury could have found that the value obtained by defendants inhered in the temporary use or possession of computer hardware, or some other value that was obtained without theft.[97]

Mendelbaum was not simply satisfying his idle curiosity. Mendelbaum testified that he read emails between Debtor and its attorneys regarding the lawsuit DROR had filed against Debtor. Becnel's testimony established that Mendlebaum reviewed not only legal counsel's communications, but also those between Smith and Higgins containing confidential business strategies and financial data.

Mendlebaum's motive was clear. He was engaged in litigation with Thundervision for the collection of accounts owed to NMI or DROR. He admitted, he was interested in the communications between Thundervision and its legal counsel for that reason. Accordingly, this Court finds that the end to the unauthorized access was to gain knowledge of the discussions between Debtor and its counsel regarding the lawsuit by DROR, financial information and business strategy, which was a thing of value. Therefore, Thundervision has also established its claim under subsection 1030(a)(4). .

### c.  Damages attributable to CFAA violations

Damage recoverable under CFAA are for "any impairment to the integrity or availability

---

[97]  *Fiber System Intern., Inc. v. Roehrs,* 470 F.3d 1150, 1168 (5th Cir. 2006).

of data, a program, a system or information." [98]   Debtor did not provide any evidence of damages

from Mendelbaum's unauthorized access except for costs incurred to investigate and to prevent

future unauthorized access.   The CFAA does not contemplate awards for consequential damages

such as lost business,  profits, or attorneys fees that are unrelated to harms of the computer itself.

Debtor claims that it should be awarded attorneys fees.  It argues that Mendelbaum's action

corrupted the legal process and it asserts,  "during the active period of Mendelbaum's hacking,

which included hacking into the attorney-client email, he was, in effect, an uninvited adversary

sharing the services of Thundervision's legal counsel.  He should therefore  pay for at least a share

of the bill for those services."  It also alleges that the attorney's fees incurred in the filing for

bankruptcy relief or the pursuit of this case should also be awarded.  Debtor acknowledges that it

found no cases in which attorneys fees of the kind requested were awarded.

In light of the aforementioned rulings regarding the universe of losses that are cognizable

under the CFAA, this Court declines to award Debtor the attorneys fees it incurred in bringing and

maintaining the Chapter 11 bankruptcy.

Debtor failed to prove that the email correspondence between itself and Phelps Dunbar

prejudiced its defense of the DROR Complaint.  It also failed to establish that but for Mendelbaum's

intrusion, it would have been able to stave off bankruptcy through more aggressive tactics in the

state court proceedings.   The Court finds that there is simply no causal connection between the

intrusion and the legal fees incurred for either defense of the State Court action or the bankruptcy

proceeding.  Under the statute, the attorney fees to assert a CFAA violation are not within the sphere

of recoverable damages.  Only Thundervision's costs to repair and protect its computer system, in

---

[98]18 U.S.C. Sect. 1030(e)(8)(A)

28

the amount of $8,700.00, were proven and sustainable under CFAA.

### 2.      The Wiretap Act

Debtor alleges that DROR, through Mendlebaum's actions, also violated 18 U.S.C. § 2510 *et. seq.* by accessing and reading emails to and from Phelps Dunbar. As noted above, Becnel's reports show that Debtor's computer system was accessed sixty-eight (68) times on twenty-eight (28) different dates by Mendelbaum.

Section 2511(1)(a) proscribes "intentionally intercept[ing] ... any wire, oral, or electronic communication," unless the intercept is authorized by court order or by other exceptions not relevant here. Section 2520 authorizes persons whose electronic communications are intercepted in violation of section 2511 to bring a civil action against the interceptor for actual damages, or for statutory damages of $10,000.00 per violation or $100 per day of the violation, whichever is greater. Recovery for violations under the Wiretap Act can result in substantial monetary awards, attorneys fees, and punitive damages.[99]

The Wiretap Act defines "electronic communications" as "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce but does not include ...any wire or oral communications."[100] The emails reviewed by Mendelbaum fall into the category of "electronic communications" for purposes of the Wiretap Act.

As noted above, the Wiretap Act demands that the electronic communication be intercepted. An "intercept" is defined as the "aural or other acquisition of the contents of any wire, electronic,

---

[99]   18 U.S.C. §2520(c)(2)(A)(B).

[100]   18 U.S.C. §2510(12).

or oral communication through the use of any electronic, mechanical or other device." [101]   The Fifth

Circuit, along with other courts, requires that the interception occur contemporaneously with the

transmission.[102]

     While it is possible that a review of email communications could be contemporaneous with

transmission, the reading of stored emails is not.  This distinction is highlighted in the case of *U.S.

v Szymuszkiezicz.*[103]  In *Szymuszkiewicz,*  emails were automatically forwarded to the defendant so

that they could be read as sent.  This case differs from *Szymuszkiewicz,* because DROR's

representative was not receiving Smith's emails as they were sent, but instead reviewing stored

versions.

     Debtor cites two cases in support of its position, *DirecTV v. Bloniarz* and *DirecTV v. Pepe.*[104]

Both cases are distinguishable.  In *Bloniarz,*  DirectTV alleged that the defendant purchased a Viper

Smart Card Reader/Writer and used the device to decrypt,  view, and assist others in decrypting and

viewing DirectTV's satellite signal without actually subscribing to DirectTV for the service

obtained. The interceptions were contemporaneous with the transmission of DirecTV's signal and

allowed the defendant to view thousands of dollars worth of free viewing over the course of just one

year.  In *Pepe*, DirecTV obtained injunctive relief, attorneys fees, and statutory damages for using

---

[101]   18 U.S.C.§ 2510(4).

[102]   *Steven Jackson Games v United States Secret Serv.,* 36 F.3d. 457 (5th Cir. 1994); *U.S. v. Turk,* 526 F.2d 654 (5th Cir. 1976), *cert denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) (replaying a previously recorded conversation was not an "intercept" ); *U.S. v. Seiger*, 318 F.3d 1039, 1047 (11th Cir. 2003), cert. denied, 538 U.S. 1051, 123 S.Ct. 2120, 155 L.Ed.2d 1095 (2003);  *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002); *Becker v. Toca*, 2008 WL 4443050 (E.D. La. 2008); and *Cardinal Health 414, Inc. v. Adams*, 582 F.Supp.2d 967, 979-81 (M.D.Tenn. 2008).

[103]   2009 WL 1873657 (E.D. Wis. 2009).

[104]   *DirecTV v. Blonairz,* 336 F.Supp.2d. 723 (W.D. Mich. 2004) and  *DirecTV, Inc. v. Pepe*, 431 F.3d 162 (3rd Cir. 2005).

pirate descrambling equipment to intercept its signal without authorization.  However, the case involved the interception of a satellite feed at the time of transmission.

Since a violation of the Wiretap Act requires "contemporaneous" interception of emails, stored emails cannot be intercepted within the meaning of the Wiretap Act.  There was no evidence that Mendelbaum obtained the emails or messages *contemporaneously* with their transmission.  As such, the Wiretap Act does not apply to the facts of this case and cannot be used to award Debtor monetary awards, attorneys fees, or punitive damages.

### 3.  State Law Claims

In addition to the above claims, Thundervision alleges damages "as a direct result of DROR's conspiracy and participation in conspiracy to damage the reputation of Thundervision and to obtain illegal and unauthorized access to the computer system, records, and emails of Thundervision."[105]  Although the allegations are inartfully drafted, the Court concludes they are sufficient to request damages based in civil tort or pursuant to La.C.C. art 2315.  La.C.C. Art. 2315 provides that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.  In this case, Thundervision asserts that Mendlebaum's invasion of its computer system was a tort for which it is due damages.  The claim  is analogous to a claim for invasion of privacy.

A tort is a civil wrong, other than for breach of contract and for which a court will provide damages.[106]  Over the centuries, certain types of conduct have been defined and as specific torts, for

---

[105]  Thundervision's Complaint.

[106]  *Prosser & Keeton on The Law of Torts*, 5th ed. Chapter 1(West Group 1984).

example, assault or conversion.  Judicial condemnation of these socially unacceptable behaviors has also resulted in a growing body of damage awards designed to give reparation to victims.[107]

The body of tort law encompasses a wide range of civil wrongs including those that 1) directly interfere with the person, *i.e.* assault or battery; 2) injuries to tangible things such as real and personal property, *i.e.* conversion or trespass; or 3) injuries to a large body of intangible interests both economic and relational, *i.e.* negligence, damage to reputation, commercial or social advantage.[108]  However, an action in tort is not dependent on defining the objectionable conduct within a previously defined name.  Prosser and other notable commentators have recognized that tort law is broader than any named categories and new and nameless torts are being recognized constantly.[109]

As Prosser explains:

> The law of torts, then, is concerned with the allocation of losses arising out of human activities; and since these cover a wide scope, so does this branch of the law.  "Arising out of the various and ever-increasing clashes of the activities of persons living in a common society, carrying on business in competition with fellow members of that society, owning property which may in any of a thousand ways affect the persons or property of others-in short, doing all the things that constitute modern living-there must of necessity be losses, or injuries of many kinds sustained as a result of the activities of others. The purpose of the law of torts is to adjust these losses, and to afford compensation for injuries sustained by one person as the result of the conduct of another." (Internal citations omitted).[110]

---

[107]  *Gillen v Phoenix Indemnity, Co.*, 198 F.2d 147 (5th Cir. 1952).

[108]  *Id.*

[109]  *Id.*; Smith, Torts Without Particular Names, 1921, 69 U.Pa.L.Rev.91; The American Law of Torts, Gans, Krause and Speiser, West Publishing 2009.

[110]  *Id.*at 6.

*                    *                    *

One factor affecting the development of tort law is the moral aspect of the defendant's conduct-the moral guilt or blame to be attached in the eyes of society to the defendant's acts, motives, and state of mind. Personal morals are of course a matter on which there may be differences of opinion; but in every community there are certain acts and motives which are generally regarded as morally right, and others which are considered morally wrong.

*                    *                    *

In a very vague general way, the law of torts reflects current ideas of morality, and when such ideas have changed, the law has tended to keep pace with them.[111]

In Louisiana, the right to privacy has been defined as "the right to be let alone," and "the right to an inviolate personality."[112] While the common law has typically declined to recognize privacy rights in business and juridical entities, the civil law has not been so constrained.[113] Louisiana courts have indicated a right to privacy in favor of corporations.[114] In *Camp, Dresser & McKee v. Steimle and Associates, Inc.,* the Court of Appeal of Louisiana, Fifth Circuit, addressed the propriety of an injunction granted under the Unfair Trade Practices Act against the plaintiff's competitor. The defendant was alleged to have rummaged through the plaintiff corporation's trash. Documents retrieved from the plaintiff's dumpster included client lists, internal memos addressing problems of the company, memoranda on financial matters, discussion of client contacts, strategy plans, private material such as handwritten love notes, sensitive data relating to the computer system

---

[111]  *Id.*at 21.

[112]  *Jaubert v. Crowley Post-Signal, Inc.*, 375So.2d 1386, 1388 (La. 1979).

[113]  *See*, David Elder, *Privacy Torts*,§1:4(West Group 2002).

[114]  *See, Camp, Dresser & McKee v Steimle and Assoc., Inc.*,652 So.2d 44 (La.App.5th Cir.1995)

33

and a document so sensitive that the plaintiff had prepared it offsite. In response, defendant argued that the corporation had neither a right nor expectation of privacy in the materials. Without a right to privacy, it followed that injunctive relief could not issue. The trial and appeals courts disagreed finding with no difficulty that the behavior was unscrupulous and that plaintiff held both a right and an expectation of privacy that were violated by defendant's actions.

The right to an inviolate personality is grounded in tort law and other members of society have a corresponding duty not to violate that right.[115] The right encompasses four different areas of interest: 1) the appropriation of an individual's name or likeness, for the use or benefit of a defendant; 2) an unreasonable intrusion upon a plaintiff's physical solitude or seclusion; 3) publicity which unreasonably places the plaintiff in a false light before the public; or 4) unreasonable public disclosure of embarrassing private facts. An actionable invasion of privacy occurs when the defendant's conduct is unreasonable and seriously interferes with the plaintiff's privacy interests.[116]

Thundervision asserts a right to privacy in its business information, privileged communications with legal counsel, and financial data. It further asserts that its rights were violated when DROR's member, Mendlebaum, accessed its computer system sixty-eight (68) times. Without question, Mendlebaum's conduct was unreasonable, indefensible, and socially unacceptable. It was also designed to gain an advantage. By reading Debtor's confidential communications with counsel, Mendlebaum hoped to discover information regarding Debtor's defense of DROR's lawsuit. In addition, the access of financial information gave DROR

---

[115] *Jaubert, supra*, at 1389, citing La.C.C.Art 2315. *See also, Spellman v Discount Zone Gas Station*, 975 So.2d 44 (La.Ct. App. 5thCir. 2007); *Zellinger v Amalagamated Clothing*, 28,127 (La.App.2 Cir. 4/3/96), 683 So.2d 726; and *Boudreaux v Allstate Finance Corp.*, 217 So.2d 439 (La.App.1st.Cir.1968).

[116] *Jaubert, supra* at 1390.

information regarding Thundervision's ability to pay any claim as well as its ability to sustain the cost of a defense to DROR's suit.   Finally, DROR's access to business records between Thundervision and IPC, its printer, gave Mendlebaum information on a competitor's pricing and business operations.   Debtor had a reasonable expectation of privacy with regard to its computer system, emails and privileged communication with its legal counsel.   The repeated unauthorized access by Mendlebaum into Debtor's computer system supports a delictual cause of action under La. C.C. Art 2315.

Thundervision has asserted general damages in connection with Mendlebaum's conduct. General damages are those which may not be fixed with any degree of pecuniary exactitude  but which involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of life-style which cannot be measured definitively in terms of money.[117]   General damages by their nature are not susceptible of exact quantification.[118]   A defendant whose wrongful act creates the difficulty in assessing damages is not entitled to complain that the amount of damages cannot be fixed.[119]   Under those circumstances, the court must fix the quantum as best it can, and has much discretion in doing so.[120]

Damages may be recovered for violation of rights without calculating altogether the pecuniary loss or privation of pecuniary gain. Where there is no proof of actual damage, however,

---

[117]    *Boswell v. Roy O. Martin Lumber Co., Inc.*, 363 So2d 506 (La. 1978).

[118]    *Wingfield v. State ex rel Dept of Transp. and Development*, 2001-2668, 2001-2669 (La. App. 1st Cir. 11/8/02), 835 So.2d 785, *rehg denied, writ den'd*.

[119]    *Austin v. Parker*, 672 F.2d 508 (5th Cir. 1982).

[120]    *Brantley v. Tremont & Gulf Railway, Co.*, 75 So.2d 236 (La. 1951); Borgnemouth Realty Co. v. Gulf Soap Corp., 31 So.2d 488 (La. 1947).

the allowance should be for a nominal amount only.[121]  As a result of DROR's conduct and based

on the findings of this Court that the conduct constitutes an actionable tort under Louisiana law, the

nominal amount of $150.00 for each unauthorized access to Thundervision's computer system is

awarded.

New Orleans, La., May 28, 2010.

Judge Elizabeth Magner

---

[121]    *Meyer v. Succession of McClellan*, 30 So.2d 788 (La.App.Orl. 1947); *Norman v Radio Station KRMD*, 187 So.831(La.App.2d Cir.1939)(Where a contract has been breached, though not in bad faith, and no actual damages are proved, nominal damages may be allowed for the technical injury).